# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x
JEFFREY R. BROOKS INDIVIDUAL                : Index No. 650781/2011
RETIREMENT ACCOUNT,
                                            : Date of Filing:
                                            : March 23, 2011
                Plaintiff,
                                            : **SUMMONS**
        -against-
                                            : The basis of venue is:
JAMES R. HENDERSON,                           Plaintiff's residence.
                                            :
                Defendant.
-----------------------------------------------------------------------x

To:     JAMES R. HENDERSON
        c/o Steel Partners, LLC
        590 Madison Ave., 32nd Floor
        New York, New York 10022

YOU ARE HEREBY SUMMONED to answer the Complaint of Plaintiff in this action and to serve a copy of your Answer on the Plaintiff's attorneys within twenty (20) days after the service of this Summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated:  New York, New York
        March 23, 2011

                                    GANFER & SHORE, LLP

                                    By: _____
                                        Steven J. Shore
                                        Ira Brad Matetsky
                                        William D. McCracken
                                    360 Lexington Avenue
                                    New York, New York 10017
                                    (212) 922-9250
                                    *Attorneys for Plaintiff, Jeffrey R. Brooks*
                                    *Individual Retirement Account*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x

| | |
|---|---|
| JEFFREY R. BROOKS INDIVIDUAL RETIREMENT ACCOUNT, | : Index No. 650781/2011 |
| Plaintiff, | : **VERIFIED COMPLAINT** |
| -against- | : |
| JAMES R. HENDERSON, | : |
| Defendant. | : |

-----------------------------------------------------------------------x

Plaintiff, Jeffrey R. Brooks Individual Retirement Account, by its undersigned attorneys, alleges as and for its Verified Complaint as follows:

## NATURE OF THE ACTION

1. This action is brought by Plaintiff, Jeffrey R. Brooks Individual Retirement Account, a shareholder of Point Blank Solutions Inc. (the "Company"), against James R. Henderson, the acting Chief Executive Officer and Chairman of the Board of Directors of the Company. Aided and abetted by the Company's current management, Henderson has engaged in serious and continuing breaches of his fiduciary duties to the Company and its shareholders including, *inter alia*, failing to cause the Company to undergo financial audits over the past two years and to make its required public filings as a registered company under the federal securities laws.

2. Compounding his misconduct, Henderson has now caused the Company to invoke the failure of Henderson and his officers and directors to have the Company to obtain and file audited financial statements with the Securities and Exchange Commission (SEC) as grounds for the proposed de-registration of the Company under the federal securities laws – a step that could

cause trading in the Company's equity securities to cease and deprive Plaintiff and the Company's other shareholders of all liquidity in their investments. Upon information and belief, this decision to de-register the Company despite the active trading in its shares, which have an aggregate market capitalization of approximately $20 million, is part of an ongoing plan to leave the Company with no alternative but to accept a proposed "going private" acquisition of the Company by venture capitalists affiliated with some of the management of the Company, including Henderson.

3. Despite substantial challenges arising from a variety of causes in recent years, the Company has been and remains a successful supplier of body armor products (such as bulletproof vests) and related accessories that are sold worldwide to a variety of customers, both military and civilian. The Company reportedly has nearly one thousand employees and sales in excess of $150 million per year. Nonetheless, the Company has been struggling to emerge from a bankruptcy case filed approximately one year ago at the instance of Henderson and persons affiliated with him.

4. The Company has acknowledged that during the approximately one-year period of the bankruptcy case, it has spent the astonishing amount of in excess of *$18 million* on professional fees, primarily for attorneys. But beginning in 2009, and continuing through the year in which the Company has been in bankruptcy, Henderson and others working with him have intentionally failed to cause the Company to expend the substantially lesser, although significant, sums for auditing and legal fees that would have allowed the Company to fulfill its legal and regulatory obligations to make its annual and quarterly SEC filings including audited financial statements.

5. Henderson and those working with him are now using the proposed settlement of a civil enforcement action that the SEC filed in February 2011 against the Company, based on the actions of prior management, as an opportunity to de-register the Company and eliminate the liquidity of its stock, which through the present has been publicly traded in an active market. In explanation of this drastic step, it is urged that de-registration is necessary because if the Company remains registered, it will be in violation of a provision of the proposed SEC settlement requiring the Company (like all the other millions of companies registered with the SEC) to satisfy its reporting requirements under federal law. Although willing to pay in excess of $18 million in other professional fees in a single year, and although willing to pay Henderson and other individuals and advisors substantial compensation, it is claimed that the Company could not afford to spend the estimated $1 million to $2 million that would assertedly be necessary to procure audited financial statements and prepare the Company's legally required public filings.

6. Among the many things that have been left unexplained is why the Company's leadership, including Henderson, as supposed turnaround and restructuring specialists, would have allowed the Company to fall into this position in the first place. Moreover, upon information and belief, all concerned have been on notice since no later than May 2010 that the SEC would require compliance with the Company's lawful obligations as a condition of any settlement of the SEC's enforcement action against the Company, yet Henderson and his colleagues apparently failed to take any steps to prepare the Company for such eventuality.

7. The shareholders' realization that the Company is pursuing the path of de-registration or "going dark" has already depressed the Company's stock price, particularly since it

appears that the Company will make no financial reports to its shareholders, which may therefore result in no trading in the Company's shares at all.

8.   Instead of creating a false emergency designed to further divest value from the public shareholders and to themselves, Henderson and the Company's other officers and directors should have taken the steps necessary to comply with the federal securities laws, thereby obviating any need to de-register the Company and thereby eliminate the liquidity of the shareholders' investments. That Henderson has not done so, in pursuit of another agenda, is evidence of his breaches of the fiduciary duty of loyalty owed to the Company and its shareholders, including Plaintiff, which should be redressed by an award of compensatory and punitive damages to Plaintiff.

## THE PARTIES

9.   Plaintiff, Jeffrey R. Brooks Individual Retirement Account, is the owner of approximately 2.4 million shares of the Company's stock, which it purchased on the open market. The beneficiary of Plaintiff, Jeffrey R. Brooks, is a natural person and has a residence in the County, City, and State of New York. Plaintiff's shares are worth between approximately $750,000 and $1,000,000 at the stock's recent trading prices. Had Henderson and the Company's current directors and officers complied with their fiduciary duties rather than violated them in the respects set forth in this Complaint and in numerous other respects, Plaintiff's interest in the Company would be worth substantially more than it is today, and substantially more than it appears it will be worth in the future.

10.   Defendant, James R. Henderson, is a natural person and a resident of the State of New York. Henderson is the Chairman and acting Chief Executive Officer of the Company. He is a member of the Company's Board of Directors. He is also a senior executive and a

representative to the Company designated by Steel Partners, LLC, a New York, New York-based venture capital firm that has sought to take over and control the Company.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action because Plaintiff is a resident of the State of New York and Defendant Henderson resides and/or has his place of business and employment in New York, New York.

12. Venue in the County of New York is proper based upon, among other things, Plaintiff's residence.

## FACTS

### A. The Company

13. The Company is a leading manufacturer and provider of bullet, fragmentation and stab-resistant apparel and related ballistic accessories, which are used domestically and internationally by military, law enforcement, security, and corrections personnel, as well as government agencies. Following the September 11th terrorist attacks and the subsequent rise in military expenditures, the Company experienced a substantial increase in its business, becoming one of the largest suppliers of body armor to the military and various federal, state, and local law enforcement agencies. Since 1998, the Company has supplied over 80% of U.S. military soft body armor vest requirements to protect soldiers and law enforcement personnel around the world; the Company's primary product, a bulletproof vest called the Interceptor, is utilized by all branches of the U.S. military. The Company is a major supplier of protective apparel in the domestic law enforcement market as well. Upon information and belief, the Company employs nearly one thousand full-time employees. In 2009, the Company reported total sales of more than $150 million.

14. The Company is currently a "registered" company pursuant to Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act"). As a registered company, the Company is required to file annual, quarterly, and certain other reports with the SEC pursuant to the provisions of the Exchange Act and the SEC's regulations thereunder. Such reports are routinely relied upon by a company's investors and potential investors, among others, in making decisions affecting their investments or potential investments. Registered companies are respected by shareholders and investment institutions because reliable information concerning such companies, including audited financial statements and other detailed information concerning their financial affairs, is readily available. Such companies also are required to have in place, among other things, appropriate accounting and audit procedures designed to ensure correct financial reporting. By contrast, trading in the shares of non-registered or de-registered companies is often completely impermissible and, even if permissible, investors are typically unwilling to invest in the securities of a company that does not provide meaningful financial reports to investors and is not subject to SEC oversight.

15. The Company's shares have been publicly traded for many years. Although the Company has not been listed on a national stock exchange since 2006, it has been, and continues to be, actively traded over-the-counter with trading reported in what is commonly referred to as the "pink sheets." There has been a continuing and active open market in the Company's shares. In the period March 17, 2011, through March 22, 2011, an average of in excess of 375,000 shares of the Company's stock was traded each day. Plaintiff purchased its shares of the Company on the open market.

16. By 2006, the Company was subject to ongoing investigations by the SEC and the U.S. Attorney's Office for the Eastern District of New York regarding alleged violations of

federal securities laws stemming from various accounting irregularities and disclosure issues prior to 2006. As a result of these investigations, in 2006 and 2007, the SEC and the U.S. Attorney's Office for the Eastern District of New York brought civil and criminal actions, respectively, against three former members of the Company's management who were ultimately found to have acted criminally in connection with the financial affairs of the Company. Although Plaintiff is the brother of one of these individuals (the Company's former CEO), Plaintiff was never civilly or criminally charged with or convicted of any misconduct.

17. In October 2007, the Company filed a comprehensive SEC Form 10-K which included, *inter alia*, restated financial statements for 2003, 2004, and 2005. During 2008 and much of 2009, the Company continued to make all its required public filings with the SEC, including financial statements, as it had in the past.

18. In August 2009, the Company received a notice from the SEC informing it that the SEC's regional staff investigating the Company had made a preliminary decision to recommend that the SEC bring a civil enforcement action against the Company.

19. On April 14, 2010, the Company (including certain of its subsidiaries) sought bankruptcy protection by filing a jointly administered voluntary petition for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware. The Company has continued in possession of its property and has continued to operate and manage its businesses as a debtor-in-possession. Before and throughout this period, Henderson has served as Chairman of the Board, as Director, and the acting CEO of the Company.

20. Following the bankruptcy filing, the Company entered into negotiations with the SEC in an effort to resolve the SEC's enforcement action. In May 2010, the Company entered into a Consent Agreement with the SEC and agreed upon a form of a Final Judgment that was

subject to, among other conditions, court approval. The Consent Agreement, which was executed on behalf of the Company by Henderson, called for the Company to enter into a settlement agreement with the SEC. The form of settlement agreement, *inter alia*, would require the Company to become current in its reporting obligations by enjoining the Company from violations of specific provisions of the Exchange Act and the SEC regulations thereunder which, *inter alia*, contain the reporting requirements.

21. Thus, the Company's directors and officers, including Henderson, knew that if uncured, the Company's ongoing failure to be current in its reporting obligations under the Exchange Act would place it in violation of the Consent Agreement once the Agreement was executed and approved by the courts. Moreover, upon information and belief, before the Consent Agreement was finalized, the SEC staff had warned the Company's leadership, including Henderson, that unless the Company was current in its reporting obligations as of the time the Consent Agreement took effect, the Company would be forced to seek to de-register as a public company so that such requirements would no longer apply.

22. Defendant and the Company's other directors and officers knew that de-registration would eliminate, or at a minimum severely damage, the liquidity of the Company's shares and unnecessarily depress their value. Nevertheless, Defendant and the Company's other directors and officers did nothing to address the Company's failure to comply with the reporting obligations imposed by law, which it had intentionally been ignoring since 2009.

23. Upon information and belief, in or about January 2011, the SEC advised the Company that it was finalizing its Complaint against the Company and further advised that the Company must seek the Bankruptcy Court's approval to enter into the Consent Agreement by

February 2011 or the SEC would not be able to inform the U.S. District Court that the parties had settled the SEC enforcement action subject to Bankruptcy Court approval.

24. Instead of making a reasonable effort to cause the Company to satisfy its reporting obligations, Henderson and the Company's other leaders allowed the Company to wait until the last possible day to seek approval for the Consent Agreement. They then caused the Company to represent that there was no real choice but to de-register the Company's shares, because the Company could not reasonably be expected to pay the professional fees and take the time necessary to prepare audited financial statements and SEC filings. This position was taken even though the Company had admittedly expended approximately $18 million since the bankruptcy filing one year ago on other professional and administrative fees and expenses, not to mention high compensation for individuals including Henderson.

25. The decision to ignore the Company's public reporting requirements over a period of two years, leading to impending de-registration of the Company's shares, was made intentionally. Upon information and belief, Henderson and others affirmatively decided in late 2009 or early 2010 to discontinue the necessary accounting and audit work on the independent audit for the year 2009, which as a result was never completed. At no time thereafter did Henderson or the Company's other directors and officers cause the Company to retain professionals to resume the necessary work so that the audits would be completed and the public filings made. The decision to cause or allow the Company to violate the law in this fashion, and the de-registration decision that followed, were not exercises of reasonable business judgment and are not entitled to the protections of the business judgment rule.

26. On March 14, 2011, the Bankruptcy Court provisionally granted the Company's motion, *inter alia*, to approve the Consent Decree with the SEC and to de-register the Company's

stock, albeit subject to a 10-day stay to allow parties-in-interest time to move for a stay pending appeal.

27. De-registration of the Company's stock may well have the effect of ending, or effectively ending, all trading of the Company's shares. Upon information and belief, the decision to de-register the Company and to "go dark" with respect to financial reporting constitutes part of an effort by Henderson and entities with which he is affiliated to systematically deprive the Company's equity holders of the remaining value of their investments or of any influence they may have over the Company's future.

28. Currently pending before the Bankruptcy Court is a proposed plan of reorganization for the Company filed on January 10, 2011 (the "Plan"). If confirmed, the Plan would effectively give rise to the liquidation of all interests in the entity held by anyone other than three favored insider entities. The proposed Plan has been the subject of a series of objections filed by various parties-in-interest based upon a number of statutory and economic grounds. The Bankruptcy Court has extended the time period for filing and consideration of objections so that the Plan will not be confirmed, if at all, until after August 2011 at the earliest.

29. In this context, upon information and belief, Henderson and others with whom he has acted in concert have caused and supported the de-registration of the Company's equity securities for the purpose of freezing out the Company's shareholders, eliminating liquidity in the Company's shares, and inducing the shareholders to go along with the Plan even though it infringes the shareholders' rights and consummates a long history of the transfer of value in the Company from the shareholders to others who have not provided reasonable value to the Company or its shareholders in return.

30. Henderson's conduct has breached his fiduciary duties owed to the Company and to all of its shareholders, including Plaintiff, and has substantially damaged Plaintiff.

## AS AND FOR A FIRST CAUSE OF ACTION

### (For Breach of Fiduciary Duty)

31. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

32. Henderson, in his capacity as a director and officer of the Company, owes the highest fiduciary duties of loyalty, good faith, and fair dealing to the Company and to each of its shareholders, including Plaintiff. These fiduciary duties require Henderson to act at all times in the best interests of the Company and its shareholders.

33. Since 2009, Henderson has breached his fiduciary duties to the Company and its shareholders by failing to cause the Company to engage qualified professionals to prepare audited financial statements and public SEC filings, as required by law and SEC regulations, even as the Company was caused and allowed to admittedly expend in excess of $18 million within a one-year period on other professional fees.

34. The failure to cause the Company to obtain audited financial statements and to prepare and file the annual, quarterly, and other SEC filings required of it as a registered Company was particularly egregious because Henderson knew that the Company was the subject of an ongoing SEC investigation and, thereafter, was a defendant in an SEC civil enforcement action, and that the standard form of settlement agreement that the SEC requires a defendant to enter into in settlement of such a civil action includes the defendant company's promise that, *inter alia*, it will satisfy all of its reporting requirements.

35. Adding insult to injury – or, more accurately, compounding injury with more injury – the misconduct of Henderson and his colleagues in failing to cause the Company to obtain audited financial statements and make public filings with the Securities and Exchange Commission (SEC) is now invoked as grounds for the proposed de-registration of the Company under the federal securities laws – a step that would cause trading in the Company's equity securities to cease and would deprive Plaintiff and the holders of approximately $20 million in market capitalization of equity securities of all liquidity in their investments.

36. Upon information and belief, the decision to de-register the Company is part of an ongoing plan to leave the Company and its shareholders with no alternative but to accept a proposed "going private" acquisition of the Company engineered by a small group of investors, for the personal benefit of Henderson and/or of the persons or entities with whom he is affiliated, rather than the benefit of the Company and all of its shareholders.

37. The shareholders' realization that the Company is pursuing the path of de-registration or "going dark" has already depressed the value of the Company's stock price, particularly since it appears that the Company will make no financial reports to its shareholders and therefore no trading in the Company's shares will be possible at all.

38. As a shareholder of the Company, Plaintiff has suffered actual injury as a direct, foreseeable, and proximate result of Defendant's breaches of his fiduciary duties of loyalty.

39. Plaintiff is entitled to recover compensatory damages for Defendant's breaches of fiduciary duties in an amount to be determined at trial, but which is believed to be not less than $2,000,000.

40. In addition, because Defendant's actions were willful and wanton and in intentional violation of Plaintiff's rights, Plaintiff should be awarded punitive or exemplary damages, in an amount to be determined at trial, but not less than $5,000,000.

WHEREFORE, Plaintiff respectfully requests that the Court grant him an award of damages against Defendant James R. Henderson for breach of fiduciary duty, in an amount to be determined at trial, but believed to be in excess of Two Million Dollars ($2,000,000), together with punitive or exemplary damages in an amount to be determined at trial but not less than Five Million Dollars ($5,000,000), all with interest at the rate prescribed by law; and granting Plaintiff such other and further relief as the Court may deem just and proper, including the costs, disbursements, and attorneys' fees of this action.

Dated: New York, New York
       March 23, 2011

GANFER & SHORE, LLP

By: _____
Steven J. Shore
Ira Brad Matetsky
William D. McCracken
360 Lexington Avenue
New York, New York 10017
(212) 922-9250
(212) 922-9335 (facsimile)
*Attorneys for Plaintiff, Jeffrey R. Brooks Individual Retirement Account*

## VERIFICATION

STATE OF NEW YORK  )
                  ) ss:
COUNTY OF NEW YORK )

JEFFREY R. BROOKS, being duly sworn, deposes and says:

I am the beneficiary of the Plaintiff herein, the Jeffrey R. Brooks Individual Retirement Account, and make this Verification on its behalf. I have read the foregoing Verified Complaint and know the contents thereof. The allegations therein are true to the best of my knowledge, except as to matters alleged therein on information and belief, and as to those matters I believe them to be true.

_____
JEFFREY R. BROOKS

Sworn to before me this
23rd day of March, 2011

_____
NOTARY PUBLIC

WILLIAM D. MCCRACKEN
Notary Public, State of New York
No. 02MC6117452
Qualified in New York County
Commission Expires Oct. 25, 2088

14